Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Mar 01 10:09 AM-20CV002039
0F081 - C85
Case: 2:21-cv-05747-ICMV Doc #: 8 Filed: 12/14/21 Page: 1 of 19 PAGEID #: 2039

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

| | |
|---|---|
| ROBERT WHITMORE<br>8818 Coldwater Drive<br>Powell, Ohio 43065<br><br>   Plaintiff,<br><br>v.<br><br>AEP OHIO<br>One Riverside Plaza<br>Columbus, Ohio 43215<br><br>and<br><br>ANDREA SHEPHERD<br>c/o AEP Ohio<br>One Riverside Plaza<br>Columbus, Ohio 43215<br><br>   Defendants. | : Case No.<br>:<br>: Judge<br>:<br>: JURY DEMAND ENDORSED<br>: HEREON |

## COMPLAINT

Plaintiff Robert Whitmore ("Whitmore"), by and through his undersigned counsel, herein states the following Complaint against Defendants AEP Ohio ("AEP") and Andrea Shepherd.

1. Plaintiff is a natural person residing in Delaware County, Ohio.

2. Upon information and belief, Defendant AEP is an Ohio corporation with its principal place of business in Columbus, Ohio.

3. Shepherd is an AEP employee and at the times pertinent to this Complaint, was Mr. Whitmore's direct supervisor

4. At all relevant times, AEP employed four or more employees within the state of Ohio.

1

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter because the amount at issue exceeds $15,000.

6. Venue is proper in this Court because AEP does business in Franklin County and the acts and omissions alleged herein took place in, among other places, Franklin County.

## FACTS COMMON TO ALL CLAIMS

7. Mr. Whitmore began his career at AEP as a contractor, working for ITS on January 2008. He was hired as full-time employee in September 2008, where he supported an operation that worked 24 hours per day, seven days per week.

8. Mr. Whitmore's spouse has a debilitating medical disability which requires him to provide assistance both at home and with her frequent doctor visits, she was diagnosed in November 2001.

9. In addition, Mr. Whitmore suffers from clotting issues and pulmonary embolisms, which require both lifelong use of blood thinners and weekly blood tests.

10. Because of these medical conditions, Mr. Whitmore worked with management to create a more flexible for him and in addition to his team members, at which time he was permitted to simplify his schedule, while continuing to work 80 hours in a two-week period, typically 35 hours one week and 45 the next.

11. To accomplish this, he opted to work nine-hour days over the two-week period, which would allow him to earn a regular day off ("RDO") once every two weeks, which he would take as needed, usually on a Friday.

2

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Mar 11 10:00 AM-20CV002039
0F081 - C87
Case: 2:21-cv-05747-KAJ Doc #: 1-1 Filed: 12/14/21 Page: 3 of 19 PAGEID #: 39

12. He was also given the option to telecommute, as were all other members of his team, and he chose to work from home on Mondays.

13. During summers, when his children were home from school, he would take vacation on the alternating Fridays so that his wife would only have to spend three full days with the children without relief. That way, he could support her on the weekends, and then work from home on Monday.

14. He worked this schedule for many years and because his team was permitted to flex their time, he typically worked nine-hour days from 6:00 a.m. to 3:00 p.m.

15. On days with high work demand, he worked longer as needed and that would be logged into his bi-weekly timesheet.

16. Mr. Whitmore was a Culture Champion for AEP, and some feedback he received was to enhance his EQ (Emotional Quotient).

17. One suggestion was to hear himself as he spoke and interacted with others. On occasion during difficult situations he would record conversations to listen to how he was perceived, his inflection, tone, etc.

18. He did this in order to become a more effective communicator, and would record PMR discussion, speeches, training, one-on-ones, interviews, and mentoring sessions.

19. Later he used this technology to protect himself after another employee cursed and harassed him.

20. Shepherd started her career at AEP as a contract employee.

21. Mr. Whitmore and Shepherd got along wonderfully, and Mr. Whitmore even gave her high recommendations for a Project Manager position they had created for her once her contract was completed.

3

22. Shepherd was eventually hired as a project manager and she and Mr. Whitmore worked together on previous projects.

23. Shepherd, in her permanent project manager role with AEP, no longer exhibited the same friendly behavior as when she was contractor, during which time some minor conflicts arose between the two in regard to Mr. Whitmore's schedule.

24. Mr. Whitmore's supervisor at the time, defended Mr. Whitmore's schedule, but noted that Shepherd had provided 360 feedback that she disliked Mr. Whitmore's schedule during summers.

25. Mr. Whitmore worked 6:00 a.m. to 3:00 p.m. during the brief time she was project manager (as AEP employee), and tried to accommodate her meetings, but she refused to come in earlier than 9:00 a.m., but would continually schedule meetings outside Mr. Whitmore's working hours.

26. While an AEP project manager, she had caused two assistants quit, caused distress to team members, harassed Mr. Whitmore about his schedule and created a more hostile environment.

27. Dispatcher Andrew Krebs noted he liked to watch the "Fights with Andrea" for entertainment.

28. Her behavior was excused as personal issues affecting the workplace.

29. She soon abandoned the project manager role that was created and left to become a manager in the metering department of AEP. She was there for a few years.

30. In September 2018, Whitmore's manager, Gary Cain retired.

31. Mr. Whitmore, Joe Neil, and Garrick Daft in addition to Shepherd all applied for the Manager position.

4

32. Mr. Whitmore was the most Senior Analyst at that time.

33. Shepherd had exhibited competitive behavior in regard to acquiring this position.

34. She viewed the other candidates as a threat and was secretive about applying for the role. Shepherd ultimately was selected for the role.

35. While Mr. Whitmore was concerned about being supervised by Shepherd, based on those past experiences, everything seemed fine at first and Mr. Whitmore continued working the schedule described above.

36. Shepherd started initiating petty confrontations with Mr. Whitmore and she began micromanaging his every action and singling him out.

37. She also threatened to go to her supervisor Paul Benjamin regarding clarification on comp time.

38. Despite Mr. Whitmore's attempts to explain the comp time policy to Shepherd, she continued accusing and intimidating Mr. Whitmore, and asked if he would like to take it up with "Paul," a new director Mr. Whitmore had never met.

39. This was the second time she threatened Mr. Whitmore with "Paul."

40. Mr. Whitmore asked if she was threatening him and stated that he would like to discuss it with Benjamin, as he was only following company policy.

41. This was one of the many bullying tactics exhibited.

42. Another threat initiated when Mr. Whitmore took an Uber during a business trip in which Shepherd stated that the return trip from a vendor event late at night should be a personal expense, even though Mr. Whitmore ensured her it was a business expense.

43. Shepherd then requested Mr. Whitmore's mileage reimbursement to and from the airport should not be reimbursed.

44. Mr. Whitmore stated it was company policy and that it saved parking fees in addition to making the vehicle available to his wife while he was traveling.

45. Mr. Whitmore had always claimed mileage to and from airport for 11 years and Shepherd's questioning of it was simply further harassment.

46. Shepherd then delayed approving expense reports and requested that detailed receipts be provided rather than the summary receipts all employees typically provided for meals.

47. She then instructed Mr. Whitmore to call each restaurant to get detailed receipt for all his meals weeks after his trip had occurred. Mr. Whitmore submitted his report without meals in order to get his flight and other expenses reimbursed.

48. Mr. Whitmore continued his standard schedule, but then was told by Shepherd in another meeting that he was not following his telecommute agreement.

49. She stated she was going to take it away because the agreement showed he worked from home on Monday and would be in the office the rest of the week.

50. This agreement was not an official schedule and only was guidance to the day he telecommuted, and did not take his comp time, vacation, RDO, or FMLA into consideration. Shepherd started harassing him with threat of losing his ability to work from home.

51. In early 2019, apparently based on absences and schedule abuse by other employees, Shepherd instituted a new policy, which, among other things required team members to be in the office more frequently and did not allow them to work from home on days they were providing on-call support.

52. This new procedure caused conflicts with Mr. Whitmore's schedule and he asked in various meetings to clarify how they would affect his long-standing schedule.

6

53. It caused a direct conflict between Mr. Whitmore and his coworker David Peck who also worked remotely on Mondays.

54. While it was later claimed that he was combative in these meetings, Mr. Whitmore was actually very respectful and simply was trying to determine if this new schedule would adversely affect his ability to accommodate wife's condition and both of their doctor's appointments.

55. After the policy change meeting, Mr. Whitmore went to AEP and officially requested an accommodation request for an alternate work schedule.

56. His wife's neurologist also provided a letter which requested that he be allowed to assist his wife by working from home two to three days per week to assist with her Activities of Daily Living ("ADL").

57. After submitting the accommodation request and getting the letter, Mr. Whitmore had another meeting with Shepherd on or about March 12, 2019 in which she was very understanding, and they devised a schedule wherein he would stop working nine-hour days and would instead work from home on Mondays and Fridays.

58. She told him that she had experience with FMLA and that this was a "workable solution" but noted that he was requesting a special exemption.

59. She said she would revisit her notes to start a FMLA request and put in a request to get two work from home days or a regular day off on Friday.

60. She made it clear that the work from home day would be one that others would not get. However, she also stated that this was a "workable solution."

61. Approximately one week later, a Department of Labor FMLA form that had been completed by his wife's doctor was sent to AEP.

7

62. Orawan Wells sent Mr. Whitmore an email stating that he needed to complete section two of the FMLA form and two days later he received an FMLA approval from Ms. Wells which permitted one to two days per week of intermittent FMLA leave of one to eight hours per occurrence.

63. Later that day he met with Shepherd and she told him that if he needed to take FMLA leave to just let her know, but now instead of two days a week he would only be permitted to take one work from home day and any other days he needed to be away from the office had to be taken a full eight hours unpaid FMLA.

64. He brought up the accommodation request he submitted in addition to the Neurologist's, recommendation, but Shepherd stated she was reading the FMLA approval by the letter and it only stated unpaid time off.

65. Mr. Whitmore then asked about being singled out because of his use of FMLA and in response Shepherd told him that others do not have FMLA and that they have to make up any missed time, but of course, no one else's time was being discussed at that meeting.

66. After that meeting, Mr. Whitmore sent an email to Ms. Wells seeking a clarification on working from home versus FMLA intermittent leave and by return email, she stated that he would only have to use unpaid FMLA time if he had exhausted all of his vacation time.

67. On March 21, 2019, he also found out in a voicemail from Orawan that the letter from his wife's neurologist requesting an alternate work schedule had not been included with the FMLA paperwork, but that information was then sent directly to Ms. Wells from Mr. Whitmore's wife, and to Shepherd from Mr. Whitmore.

68. Orawan stated she would talk with her supervisor to get it included.

8

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Mar 01 12:00 PM-20CV002039
0F081 - C93
Case: 2:21-cv-05747-KLL Doc #: 1-1 Filed: 12/14/21 Page: 9 of 19 PAGEID #: 39

69. Meanwhile, Shepherd had difficulty managing all the vacation requests from the policy change and sent an email with a new policy to allow the team to work out their own schedules.

70. In her email, she stated that she allowed them to have more than one person work from home at a time in addition to scheduling their time off without approval as long as it provided coverage of a minimum of two people in the office.

71. She also allowed individuals to continue to work from home even when on-call as long as someone in the office covered for them.

72. As a result, Mr. Whitmore continued his schedule and decided to use comp time and vacation on Fridays as always.

73. Whitmore was responsible for firmware updated to plant equipment and wanted to complete this work quickly eliminate support issues.

74. This was standard "O&M" (Overhead and Maintenance) work as it did not provide new functionality.

75. Shepherd delayed Mr. Whitmore's work, trying to get it put under a capital project, meaning rate payers would have to pay for this. This is an ethics violation and looked down on by the PUCO.

76. Shepherd continued to delay work and try to coerce Mr. Whitmore to unethically allocate this work to a budget that would lower her department cost.

77. Shepherd also tried to misallocate O&M dollars for license agreements, that AEP was responsible to pay, to try to lower her budget, only to repurchase the same licenses on the next years at a substantial cost on capital.

9

78. AEP highly discourages this practice of offloading standard costs in order to get them reimbursed by billing the customer.

79. On June 13th, Mr. Whitmore had a one on one with Shepherd, to work on his performance management review ("PMR").

80. There were no "negatives" regarding Mr. Whitmore discussed in the meeting or any no problems with his performance.

81. Mr. Whitmore, as part of his PMR, needed to select a mentor for his ongoing development.

82. He had met with Shepherds supervisor, Paul Benjamin for lunch. A few days after the lunch, Mr. Whitmore requested that Paul be his mentor, and Paul accepted.

83. Mr. Whitmore did not officially tell Shepherd who his mentor was at this time but did not hide the fact and his calendar and meetings with Shepherd was public.

84. Mr. Whitmore noticed a stark change in Shepherd's behavior towards him and felt hostility in her comments and was demeaning in her behaviors towards him, especially in private meetings.

85. He continued to record audio conversations of these interactions.

86. Mr. Whitmore went on vacation June 21st and returned on July 10th.

87. He had his second mentoring session with Paul Benjamin, who is also Shepherd's direct supervisor, in the early afternoon and then went to a prescheduled meeting with Shepherd, which Mr. Whitmore thought was another PMR review.

88. However, when he arrived at the meeting, Amy Reed from Human Resources was there with Shepherd.

89. Shepherd then handed him a performance improvement plan ("PIP"), which Mr. Whitmore refused to sign wanting substantiation for the claims against him.

90. He was told he was not violating, but these were the new expectation for him only. Whitmore asked multiple time why he was being singled out.

91. Shepherd refused to discuss the PIP with him even though he specifically asked if this was being done in retaliation for his schedule and request for FMLA, and retaliation for mentoring with her Supervisor.

92. He was also not told how long the PIP would last and was told Shepherd could refuse to allow him to work from home.

93. Mr. Whitmore was also told by HR that what was "fair is not equal" and that Shepherd was permitted treat him differently from other employees, and not allow him to work from home, and could make him ask for approval from Shepherd even though that was not her policy.

94. Reed would not address the items on the PIP and would not look at Mr. Whitmore's concerns. Both Reed and Shepherd stated that it was not what I had violated, but only their expectations for me in the future.

95. Mr. Whitmore, being in a hostile work environment, felt threatened by Shepherd even more after the PIP.

96. He contacted Leslie Rittenhouse in HR on August 6th.

97. She set up a meeting and he expressed his concerns about FMLA, schedule and hostile work environment.

98. She reviewed the PIP and stated it looked like many of the items were "petty" and that Shepherd would have to give Mr. Whitmore an end date for the PIP.

11

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Mar 11 2:00 PM-20CV002039
0F081 - C96
Case: 2:21-cv-00572-EAS-CMV Doc #: 8 Filed: 12/14/21 Page: 12 of 19 PAGEID #: 239

99. Rittenhouse agreed to follow up on Mr. Whitmore's concerns and speak to his mentor, Shepherd's supervisor Paul Benjamin.

100. In a follow-up meeting with Rittenhouse, Mr. Whitmore expressed that he did not feel safe alone in the room with Shepherd, and that he could request a male presence in all future meetings to safeguard against potential sexual or physical accusations from Shepherd.

101. As a result, Mr. Whitmore's mentor, Paul Benjamin, also Shepherd's direct supervisor, or Bruce Pecci, Paul's Supervisor mediated and was present during all future interactions between Whitmore and Shepherd.

102. After trying to work through the PIP and countless interactions with Shepherd, Benjamin, Pecci, and Rittenhouse, he was told by Pecci, that there was nothing he could do and the PIP would remain, even if Whitmore did not sign it.

103. Mr. Whitmore requested to know the timeframe of the PIP based on Rittenhouse's recommendation.

104. Near of the end of the meeting on August 13th, Pecci then joked with Shepherd about the length of the PIP.

105. Pecci stated three months, six months, and Shepherd smiled and responded "30 days".

106. Mr. Whitmore attempted to apply for other positions in AEP and requested to know if the PIP was preventing him from getting interviews.

107. He applied for other positions trying to get out from under Shepherd's supervision, who he felt was diligently trying to get him fired.

108. He asked Rittenhouse if Shepherd was blocking him.

109. Rittenhouse stated that if she did, she would have to tell Mr. Whitmore.

12

110. Mr. Whitmore never was informed that he was being blocked.

111. Mr. Whitmore, in a PIP meeting with Benjamín, stated that he typically would not hire an employee on a PIP and that Mr. Whitmore just had to work through it.

112. Mr. Whitmore contacted AEP's Ethics and Compliance department on September 5th and told them that he felt he was being retaliated against because of his wife's disability.

113. They told him they would "investigate" the charges.

114. Mr. Whitmore was assured that if provided his name when he made the report that AEP had a no termination or retaliation policy in place and that his report was confidential.

115. Mr. Whitmore, met with Shepherd and Benjamin on September 11, 2019. This meeting went well, and it was stated that Mr. Whitmore was performing well on his PIP.

116. Stephanie Caudill, of Ethics and Compliance, finally interviewed Mr. Whitmore on September 26th in order to begin the discrimination and retaliation investigation for AEP. Caudill stated she would start following up with interviews.

117. Mr. Whitmore kept in contact with Caudill on all instances with Shepherd. Shepherd was on vacation for two weeks.

118. When she returned, Mr. Whitmore had lost his father and was away on bereavement leave. Shepherd was scheduled to meet with Caudill on October 11, 2019.

119. On Thursday, October 10th, the day before Shepherd's meeting with Ethics and Compliance, Mr. Whitmore was scheduled to have his normal PIP meeting with Shepherd.

120. Without his knowledge, Shepherd rescheduled their meeting for Monday October 14th, when he was scheduled to be working from home.

121. When he went to her office and Benjamin was not there, she stated that she cancelled the meeting, and rescheduled on Monday.

13

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Mar 11 12:00 PM-20CV002039
0F081 - C98
Case: 2:21-cv-00574-CMV Doc #: 8 Filed: 12/14/21 Page: 14 of 19 PAGEID #: 2039

122. It was a brief two-minute interaction in her doorway, during which she also told him he could no longer work from home on Monday the 14th if he was going to take vacation the following Friday.

123. He told her there were plans set for Monday in regard to his father's estate. He was also frustrated waiting for last minute approvals from Shepherd on his FMLA/vacation time and felt that she was playing games.

124. The conversation ended when he said to just go ahead and disapprove Monday.

125. She agreed and he asked if that was all.

126. He then went back to his workstation and emailed Caudill in Ethics and Compliance regarding the cancellation of his telecommute day and what he felt was additional retaliation especially after a death in his family.

127. The next day, Friday October 11th, Mr. Whitmore was contacted via phone by Amy Reed in HR and Benjamin.

128. Mr. Whitmore found out that Shepherd apparently claimed that he had threatened her during their interaction as he stood in the doorway on October 10th and, based on that allegation, was being suspended with pay effective October 11, 2019 until they could investigate Shepherd's claim. They implied it would be a couple of days to investigate.

129. Mr. Whitmore attempted to contact Caudill regarding this false accusation, but only received an email response in regards.

130. Mr. Whitmore did not hear from anyone at AEP in regard to the investigation of the claim for 12 days, in which his electronic access, email, and building access, had been terminated.

14

131. On October 23, 2019 Amy Reed from HR arranged and offsite visit with Mr. Whitmore in order to discuss the outcome of the investigation.

132. At that meeting Mr. Whitmore was terminated effective October 24th. He was informed his termination was due to his PIP performance and that the investigation in the false threat from Shepherd never took place.

133. Amy Reed was laughing during the termination, and Mr. Whitmore asked her to please stop laughing.

134. Bruce Pecci also confirmed to Mr. Whitmore it was exactly as he had taunted in their previous meeting that there was nothing he could do even if he went to HR and Ethics & Compliance.

135. Amy Reed informed him that they would continue group legal plan and health insurance till the end of November to allow time to go to doctor.

136. Whitmore scheduled all doctor, dentist, and vision appointments for November, only to find out AEP had terminated his insurance on October 31st. His wife's medical claim was being denied for lack of insurance. Whitmore's wife cancelled all appointments as without pay they could not afford these bills.

137. Mr. Whitmore paid for these health and legal benefits out of his final paycheck on November 1st assuming he was covered.

138. Whitmore contacted Amy Reed on November 25th, who stated she had "accidentally" cut off benefits and would reinstate them.

139. Reed, responded on November 26th that they had "fixed" her error, however this was too late for Whitmore's wife to reschedule appointments as the 27th was the last business day of the month before the two-day holiday.

15

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Mar 11 2:00 PM-20CV002039
0F081 - D1
Case: 2:21-cv-00574-CMV Doc #: 8 Filed: 12/14/21 Page: 16 of 19 PAGEID #: 207

140. Mr. Whitmore was also actively using AEP's group legal plan through Hyatt Legal for defense of a civil case he was involved in regards his father estate.

141. Amy Reed stated she would send a packet to continue this coverage.

142. This never arrived and when Mr. Whitmore called to get the extension it was past the date.

143. This was retaliation as Reed knew Mr. Whitmore would seek counsel, even though the Hyatt plan prevent counsel against the employer, cutting this off adversely affected Mr. Whitmore's civil suit.

144. AEP's actions especially through Shepherd's conduct, constitutes discrimination. In addition, his termination qualifies as an adverse employment action as part of illegal retaliatory conduct in violation of Ohio Revise Code § 4112.

## COUNT I
## DISABILITY AND AGE DISCRIMINATOIN AND RETALIATION
## OHIO REVISED CODE CHAPTER 4112

145. Plaintiff realleges and restates the facts and allegations above, as if fully rewritten herein.

146. Mr. Whitmore was an "employee" as that term is defined in R.C. 4112.

147. AEP is an "employer" as that term is defined in R.C. 4112.

148. At the time he was discharged he was physically able to perform his duties and otherwise met the requirements of his job and laws pertaining to the relationship between employer and employee.

149. As addressed above, Mr. Whitmore was subjected to a hostile and discriminatory workplace based upon his disability when, among other things, he was denied a reasonable

16

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Mar 17 12:00 PM-20CV002039
0F081 - D2
Case: 2:21-cv-00573-EAS-CMV Doc #: 8 Filed: 12/14/21 Page: 17 of 19 PAGEID #: 289

accommodation, when he was singled out because of his use of intermittent FMLA leave and with regard to his having had a blood clotting disorder that required hospitalization.

150. Furthermore, Whitmore was terminated in part due to the cost of his wife's treatment, and the attempted use of FMLA time to care for her.

151. Furthermore, Mr. Whitmore, being in a hostile work environment, felt threatened by Shepherd before and especially after the PIP.

152. He contacted Rittenhouse in HR on August 6th and eventually expressed his concerns about FMLA, schedule and hostile work environment.

153. She reviewed the PIP and stated it looked like many of the items were "petty" and that Shepherd would have to give Mr. Whitmore an end date for the PIP.

154. In addition, he was subjected to age discrimination when managers and directors stated directly to Mr. Whitmore that if they got rid of his salary, they could hire two new employees.

155. After Mr. Whitmore was terminated, two new positions were opened up and, on information and belief, two new employees under age 40 were hired.

156. After complaining about the disability and age discrimination addressed above, Mr. Whitmore was retaliated against when he faced the adverse employment actions of both being placed on a PIP and being terminated.

157. As a direct and proximate cause of Defendants' actions in violation of R.C. 4112, Mr. Whitmore has been damaged in an amount more than $25,000, which will be proven at trial.

## COUNT II
### RETALIATION UNDER OHIO REVISED CODE CHAPTER 4113.52

158. Plaintiff realleges and restates the facts and allegations above, as if fully rewritten herein.

17

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Mar 11 2:00 PM-20CV002039
0F081 - D3
Case: 2:21-cv-00574-CMV Doc #: 8 Filed: 12/14/21 Page: 18 of 19 PAGEID #: 289

159. Mr. Whitmore was actively expressing concerns over the misappropriation of funds to have AEP's customers pay for expenses that were in reality company expenses and Shepherd wanted to remove him because of that activity.

160. Mr. Whitmore also brought attention to environment concerns with equipment he was responsible for in which the system grossly violates environmental agreements and licensing.

161. Mr. Whitmore brought these violations up on multiple occasions but dropped them due to already feeling harassed.

162. Mr. Whitmore expressed those concerns to his superiors both orally and in writing, by way of email correspondence.

163. Upon information and belief, no one at AEP took the actions required by among other things, R.C. 4113.52(A)(1)(a).

164. No one at AEP reported back to Mr. Whitmore regarding his report, as required by R.C. 4113.52(A)(1)(b).

165. In addition to violating R.C. 4112, Mr. Whitmore's termination qualifies as a prohibited disciplinary or retaliatory action under R.C. 4113.52(B).

166. Because AEP's retaliatory actions violate, among other things, R.C. 4113.52(B), Mr. Whitmore is entitled to the remedies outlined in R.C. 4113.52(C), including "reinstatement of the employee to the same position that the employee held at the time of the disciplinary or retaliatory action and at the same site of employment or to a comparable position at that site, the payment of back wages, full reinstatement of fringe benefits and seniority rights, or any combination of these remedies."

167. As a direct and proximate cause of Defendant's actions, Mr. Whitmore has been damaged in an amount more than $25,000, which will be proven at trial.

18

WHEREFORE, Mr. Whitmore demands the following:

As to Count I and II , lost pay and benefits, compensatory and punitive damages, and attorney fees and costs, in an amount to be determined at trial, but in any event, not less than $25,000 plus the equitable remedies of reinstatement and/or front pay and such other relief as the Court may deem appropriate.

>Respectfully submitted.
>
>DEWITT LAW, LLC
>
>*/s/ Michael W. DeWitt*
>Michael W. DeWitt (0066896)
>4200 Regent Street
>Suite 200
>Columbus, Ohio 43219
>(614) 398-2886
>(614) 370-4552
>(614) 750-1379 (facsimile)
>mdewitt@dewittlawco.com
>Attorney for Plaintiff

## **JURY DEMAND**

Whitmore demands that a jury decide all claims in this matter that are triable to a jury.

>*/s/ Michael W. DeWitt*
>Michael W. DeWitt (0066896)